**[ORAL ARGUMENT REQUESTED]**

**Nos. 25-2102 & 25-2103**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

---

TOBIN DOLAN and MARIANNA LANDS, et al.,

Plaintiffs-Appellees,

v.

FEDERAL EMERGENCY MANAGEMENT AGENCY, et al.,

Defendants-Appellants.

---

Consolidated Appeals from the United States District Court
for the District of New Mexico
District Court Case Nos. 23-cv-869 & 23-cv-908 (Judge James O. Browning)

---

# REPLY BRIEF FOR APPELLANTS

---

*Of Counsel:*

JAMES EVANS
*Chief Counsel*
JORDAN FRIED
*Senior Counsel*
LINDSAY RAUSCH
*Trial Attorney*

*Federal Emergency Management Agency*

BRETT A. SHUMATE
*Assistant Attorney General*

AUGUST E. FLENTJE
CAROLINE W. TAN
*Attorneys, Appellate Staff*
*Civil Division, Room 7236*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-4171*

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION .......... 1

ARGUMENT .......... 6

I. The Act Does Not Require Payment of Noneconomic Damages. .......... 6

II. The District Court Erred in Considering and Applying New Mexico Law. .......... 26

CONCLUSION .......... 34

REQUEST FOR ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Amparan v. Lake Powell Car Rental Cos.*,
882 F.3d 943 (10th Cir. 2018) .......... 33

*Federal Aviation Admin. v. Cooper*,
566 U.S. 284 (2012) .......... 22, 24

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 24, 26

*Padilla v. Lawrence*,
685 P.2d 964 (N.M. Ct. App.), *cert. denied*,
683 P.2d 1341 (N.M. 1984) .......... 5, 28, 32

*Rodgers v. City of Loving*,
573 P.2d 240 (N.M. Ct. App. 1977) .......... 29

*United States v. Bormes*,
568 U.S. 6 (2012) .......... 21

**Statutes:**

Hermit's Peak/Calf Canyon Fire Assistance Act,
Pub. L. No. 117-180, div. G, 136 Stat. 2168 (2022):
§ 102 .......... 31
§ 102(a)(9) .......... 16, 19
§ 102(b)(1) .......... 23
§ 103(4) .......... 17
§ 103(4)–(5) .......... 18
§ 103(5) .......... 16
§ 104(a) .......... 25
§ 104(a)(1) .......... 2, 6, 14, 18, 23, 26
§ 104(c) .......... 25
§ 104(c)(1) .......... 13, 14, 22
§ 104(c)(2) .......... 3

§ 104(c)(3) ..... 21
§ 104(c)(3)(A) ..... 22
§ 104(d) ..... 26
§ 104(d)(1)(A)(i) ..... 13
§ 104(d)(1)(B)(iv) ..... 7, 8
§ 104(d)(1)(C) ..... 11
§ 104(d)(2)(A) ..... 11
§ 104(d)(4) ..... 7, 8, 11, 18, 25
§ 104(d)(4)(A)(vi) ..... 20
§ 104(d)(4)(B)(vi) ..... 20
§ 104(d)(4)(C) ..... 20
§ 104(d)(4)(C)(x) ..... 20
§ 104(e) ..... 3, 18
§ 104(f) ..... 26
§ 104(h)(1)–(2) ..... 3, 18
§ 104(k) ..... 11

28 U.S.C. § 1346(b)(1) ..... 16

28 U.S.C. § 2402 ..... 31

42 U.S.C. § 2210 note ..... 19

49 U.S.C. § 40101 note ..... 19

N.M. Stat. Ann. § 68-5-2 ..... 29

N.M. Stat. Ann. § 68-5-3 ..... 29, 30

N.M. Stat. Ann. § 68-5-4 ..... 29

N.M. Stat. Ann. § 68-5-7 ..... 30

**Regulations:**

44 C.F.R. § 296.21 ..... 1

44 C.F.R. § 296.21(e)(3) ..... 20

**Rules:**

N.M. R. Ann. 13-1812 .......... 14

N.M. R. Ann. 13-1815 .......... 14

N.M. R. Ann. 13-1819 .......... 14

**Other Authorities:**

FEMA,
*Public Data*, https://perma.cc/6P9J-P47N .......... 1

Memorandum Opinion and Order,
*Gallegos v. FEMA*,
No. 1:24-cv-170 (D.N.M. July 21, 2025), Dkt. 74 .......... 10

N.M. Energy, Minerals & Nat. Res. Dep't,
*New Mexico Prescribed Burning Act: Fact Forward*,
https://perma.cc/W99X-2XQP .......... 30

*Under*,
Black's Law Dictionary (12th ed. 2024) .......... 13

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Cerro Grande Act | Cerro Grande Fire Assistance Act of 2001 |
| FEMA | Federal Emergency Management Agency |
| Fire | Hermit's Peak/Calf Canyon Fire |
| FTCA | Federal Tort Claims Act |
| Hermit's Peak Act or Act | Hermit's Peak/Calf Canyon Fire Assistance Act |

## INTRODUCTION

Since 2023, the Federal Emergency Management Agency (FEMA) has paid over 24,000 claims for injuries resulting from the Hermit's Peak/Calf Canyon Fire. FEMA, *Public Data*, https://perma.cc/6P9J-P47N. Those payments total over $3.48 billion (and counting) and compensate eligible claimants for a wide range of losses. *Id.* FEMA has paid claimants (including many of the plaintiffs here) to rebuild or repair their homes; to remove debris and burned trees from their lands; to reforest or replace destroyed trees and landscaping; and to cover insurance deductibles, cleanup costs, and temporary relocation expenses, among other costs. *See* 44 C.F.R. § 296.21. FEMA continues to process claims for payments and currently has over 8,000 pending claims in its system. *See* FEMA's Response at 2, *Arellano v. FEMA*, No. 1:26-cv-221 (D.N.M. Apr. 29, 2026), Dkt. 21. Managing this scheme is a delicate balancing act: Because the amount of funding is finite, an increased award to one claimant necessarily reduces the amount of money left for others.

The question in this case is whether FEMA is statutorily required to also compensate for annoyance, inconvenience, sentimental value, or

other noneconomic losses. FEMA correctly concluded that the answer is no. That conclusion flows directly from the statutory text. In the operative provision governing payment, Congress specified that "compensation" under the Act would be "subject to" two important limitations: the "availability of appropriations" and FEMA "making the determinations required under [§ 104](d)." Hermit's Peak/Calf Canyon Fire Assistance Act (Hermit's Peak Act or Act) § 104(a)(1), Pub. L. No. 117-180, div. G, 136 Stat. 2168 (2022). Section 104(d)(4), in turn, specifies which damages are allowable—property, business, and financial loss—and emphasizes Congress's focus on measurable, economic harms. Section 104(d)(4) does not otherwise authorize payments outside of those broad categories. Far from being restrictive, § 104(d)(4) includes an exhaustive list of 19 permissible types of loss and authorizes FEMA to pay for "[a]ny other loss" within those three categories that FEMA deems appropriate.

The district court concluded otherwise based on an incomplete reading of the statute. Judge Browning believed that Congress incorporated all of New Mexico tort law through the term "calculation," which appears in the choice-of-law provision in § 104(c)(2). *See*

App.2.127–128. But that provision, by its own terms, limits application of New Mexico law to the "calculation of damages *under* [§ 104](d)(4)," the allowable-damages provision. Act § 104(c)(2) (emphasis added). Thus, "calculation" in § 104(c)(2) cannot be read to expand the universe of permissible claims beyond what is listed in § 104(d)(4). Judge Browning did not acknowledge the "under [§ 104](d)(4)" clause at all, and it is unclear whether he realized what the full text of § 104(c)(2) instructed. Plaintiffs replicate this error on appeal when they repeatedly excise that very same limitation when quoting § 104(c)(2). *Dolan* Br. 4, 8, 18, 25; *Lands* Br. 9–10.[1]

That the district court ignored one-half of the provision on which it rested its theory of the statutory scheme underscores the magnitude of the court's error. That theory also cannot withstand scrutiny on its own terms. The court appeared to believe that the statute incorporates all of New Mexico tort law. But Congress created the Hermit's Peak Act as an *alternative* to the Federal Tort Claims Act (FTCA), not a substitute for it. *See* Act § 104(h)(1)–(2); *id.* § 104(e) (accepting FEMA's offer bars related

---

[1] "*Dolan* Br." refers to the *Dolan* plaintiffs' brief (Dkt. 42). "*Lands* Br." refers to the *Lands* plaintiffs' brief (Dkt. 45).

FTCA suit). Rather than go through the uncertainty and expenses of FTCA litigation, the Hermit's Peak Act offers eligible claimants an opportunity for expedited relief. As part of that tradeoff, however, Congress limited recovery to the economic harms in § 104(d)(4). That limitation makes sense: Economic damages are more predictable and easier to quantify than noneconomic damages and are therefore a much better fit for a compensatory scheme designed to divvy up a limited amount of funding quickly. Far from trying to limit recovery, FEMA's Final Rule reflects the agency's effort to ensure that the limited pot of money is distributed equitably and is not depleted by first-movers who happen to be further up in the queue.

But even if this Court believes that the Act incorporates New Mexico tort law, the appropriate course is to remand to the agency to reconsider the relevant portion of the Final Rule based on the correct legal framework. In declining to do so, the district court usurped FEMA's authority to administer this scheme in the first instance. The court also erred in its actual application of New Mexico law. Whether or not the government's actions amounted to a tort under state law requires a fact-specific inquiry into the government's conduct and how that conduct

relates to each claimant. (Indeed, the fact that such individualized inquiries would be required to establish tort liability is a strong sign that this compensation scheme has *not* incorporated New Mexico law to determine the allowable categories of compensation.) And in all circumstances, the district court's analysis failed to appreciate that nuisance and trespass are different torts protecting different interests and ought not be "blur[red]" together. *Padilla v. Lawrence*, 685 P.2d 964, 970 (N.M. Ct. App.), *cert. denied*, 683 P.2d 1341 (N.M. 1984) (table decision).

## ARGUMENT

### I. The Act Does Not Require Payment of Noneconomic Damages.

**A.** Congress spoke clearly in delineating the scope of compensation under the Act. The relevant starting point for evaluating that authorization is § 104. (The other sections, §§ 101–103, set forth the title, findings, and definitions, and not the substantive requirements governing payment.) In the operative provision governing payment, § 104(a)(1) specifies that eligibility for "compensation" under this scheme is "subject to" two limitations: (1) the "availability of appropriations," and (2) FEMA "making the determinations required under [§ 104](d)." Act § 104(a)(1).

Congress therefore funneled all payment determinations through § 104(d), appropriately titled "Payment of Claims." Congress reinforced § 104(d)'s operative role in several places. For example, in § 104(c)(1), Congress instructed FEMA to "determine" any claim for payments "[i]n accordance with [§ 104](d)." And in § 104(c)(2), Congress linked the "calculation" of damages to § 104(d)—specifically, the "damages under [§ 104](d)(4)." As to § 104(d) itself, Congress specified that one of the "parameters" of FEMA's determinations include whether "sufficient

funds are available for payment" and, "if, so, the amount, if any, to be *allowed* and paid under this Act." Act § 104(d)(1)(B)(iv) (emphasis added).

The only provision within § 104(d) that bears on the categories of eligible damages is § 104(d)(4), appropriately titled "Allowable Damages." That provision lists the three broad categories of damages that are compensable under the Act: property, business, and financial loss. Far from establishing a "restrictive ceiling," *Dolan* Br. 8, 20, § 104(d)(4) enumerates, in exhaustive detail, a list of 19 types of allowable losses within the categories of property, business, and financial loss. That list includes damage to "physical" infrastructure and "tangible" assets, as well as more granular losses, such as insurance deductibles, mortgage interest costs, "lost subsistence from hunting, fishing, firewood gathering, timbering, grazing, or agricultural activities," "premium[s] for flood insurance," "[e]mployee wages for work not performed," and the cost of "reasonable efforts, as determined by the [FEMA] Administrator, to reduce the risk of wildfire, flood, or other natural disaster." Act § 104(d)(4).

All of the enumerated losses focus on measurable, pocketbook injuries. Each category further includes a catchall provision that permits FEMA to pay for "any other" loss that the agency deems appropriate as a property, business, or financial loss. Act § 104(d)(4). Section 104(d)(4) does not contemplate payment for losses outside of those three categories. Nor does it mention compensation for any kind of noneconomic harm, such as plaintiffs' claims for payment for the sentimental value of lost trees (which is separate and apart from the cost to replant those trees or reforest those lands—a cost that, to be clear, FEMA *would* reimburse if substantiated). *See* App.1.36–37.

Moreover, nothing about § 104(d)(4) suggests that the list of damages is meant to be merely illustrative, as plaintiffs suggest. Indeed, the title of § 104(d)(4)—Allowable Damages—strongly suggests the opposite. As previously explained (Opening Br. 24), "allowable" means "permissible," and it follows that categories of losses left off a detailed list of "allowable" damages are, by extension, not allowed. That interpretation also squares with § 104(d)(1)(B)'s requirement that FEMA "determine" the "amount, if any, to be *allowed* and paid under this Act." Act § 104(d)(1)(B)(iv) (emphasis added). Plaintiffs' suggestion (*Lands*

Br. 13) that § 104(d)(1)(B) has nothing to do with § 104(d)(4) ignores that plain textual connection.

Congress has therefore authorized reimbursement for the costs of rebuilding homes or replanting trees, but not for the annoyance of having to rebuild (which is separate and apart from the costs of rebuilding itself) or for the sentimental value of losing those trees (which is separate and apart from the cost of reforesting). That exclusion makes sense. The Act is a compensation scheme designed to disburse a limited set of funding in a quick and efficient manner. Noneconomic harms are intangible and notoriously difficult to quantify, and mandating their consideration would substantially slow down FEMA's ability to quickly divvy up the available funding. Indeed, it is far from obvious how FEMA could "investigate" a claim for reimbursement based on the annoyance of rebuilding, and plaintiffs offer no explanation on this point.

Mandating consideration of noneconomic damages may also lead to inequitable distributions of funding. As previously explained (Opening Br. 25–26), noneconomic damages can be unbounded and far exceed recovery for economic harms. As a practical matter, requiring their consideration would favor first-movers who claim the largest

noneconomic losses regardless of the actual severity of their economic harm. That could easily result in a situation where some claimants take home a significant portion of the pot, depleting the funding available for others, most of whom are unrepresented and many of whom are seeking to rebuild their homes. This possibility is not merely hypothetical. There is less than $2 billion left of the $5.45 billion appropriated for this fund and over 8,000 pending claims remaining. *See supra*, at 1. In a different case also arising under this scheme, Judge Browning has awarded wildly different amounts for noneconomic losses that are seemingly unrelated to the severity of the claimed injury. *Compare* Memorandum Opinion and Order at 83, *Gallegos v. FEMA*, No. 1:24-cv-170 (D.N.M. July 21, 2025), Dkt. 74 (awarding $9,000 to one plaintiff for annoyance related to 10-day displacement during which individual slept in his car), *with id.* at 86 (awarding $150,000 to a different plaintiff for annoyance related to a 16-day displacement where the plaintiff stayed with friends).[2]

There is no reason to think Congress intended to authorize such a free-for-all process that could lead to these obvious inequities,

[2] An appeal is currently pending. *See Gallegos v. FEMA*, No. 25-2107 (10th Cir.) (opening brief due June 15, 2026).

particularly over the objections of the agency statutorily tasked with administering this scheme. Nor is there any reason to think the Act should be read this way when the text repeatedly funnels payment determinations through § 104(d) and has a provision that, by its own terms, dictates which damages are "allowable." Act § 104(d)(4).

Plaintiffs contend that the phrase "may include" in § 104(d)(4) suggests that the allowable-damages provision is a floor on damages. *Dolan* Br. 20; *Lands* Br. 22–23. Plaintiffs' arguments would have more force if Congress introduced the term "may" before identifying the three allowable categories of loss. But that is not what Congress did. Congress included the term "may" only after each category of loss is identified, as part of a menu of allowable losses that *may* be awarded as property, business, or financial loss. Thus, nothing about the term "may" suggests authorization for damages beyond property, business, or financial loss. Moreover, § 104(d)(4)'s reference to "otherwise uncompensated" merely ensures that there is not double recovery for injuries suffered, consistent with Congress's recognition that victims may have already received "insurance benefits" or other payments that would reduce their entitlements to payment. *See, e.g.*, Act § 104(d)(1)(C), (2)(A), (k).

**B.** The district court believed that the Act incorporates all of New Mexico tort law based on various provisions outside of § 104(d). The court relied almost entirely on the term "calculation" in § 104(c)(2), a provision that is titled "Applicability of State Law" and is located within § 104(c), the claims-investigation provision, not in § 104(d)'s payment provision.

The district court concluded that § 104(c)(2) amounted to a full incorporation of New Mexico tort law. *See* App.2.127–128. Read in full, § 104(c)(2) is a choice-of-law provision that states: "Except as otherwise provided in this Act, the laws of the State of New Mexico shall apply to the calculation of damages under [§ 104](d)(4)." The court appeared to believe that this provision ended at "calculation of damages." As a result, the court did not acknowledge the second half of § 104(c)(2), which expressly subjects any "calculation" to the "calculation of damages *under* [§ 104](d)(4)." Act § 104(c)(2) (emphasis added). Nor did Judge Browning acknowledge the first clause in § 104(c)(1), which specifies that the following requirements must be "[i]n accordance with [§ 104](d)."

The district court's conclusion cannot stand for the simple reason that the court apparently did not finish reading the statute. And even though FEMA identified this oversight in its motion for reconsideration,

App.3.13–14, the court repeated its error in its opinion denying reconsideration, failing again to acknowledge the "under § 104(d)(4)" clause at all. App.4.1–142. Plaintiffs replicate this error in their briefing, repeatedly excising that same clause when quoting § 104(c)(2). *See Dolan* Br. 4, 8, 18, 25; *Lands* Br. 9–10.

That oversight is fatal to the district court's theory. "Under" is a limiting term and means "[c]onstrained by" or "[s]ubject to." *Under*, Black's Law Dictionary (12th ed. 2024). Thus, its inclusion in § 104(c)(2) means that the application of New Mexico law applies only to *calculating* the damages listed in § 104(d)(4). "Calculation" therefore cannot be read to expand the universe of compensable claims beyond what is allowable under § 104(d)(4), and the court erred in reading "calculation" to do precisely that. Nor can "calculation" be read as broadly as Judge Browning believed. App.2.130. As explained (Opening Br. 28–29), the ordinary meaning of "calculation" is "mathematical computation." The notion that Congress intended this term to mean "determination" in this provision, as the district court surmised, is at odds with the fact that Congress used the term "determine" in other adjacent provisions but did not do so here. *See, e.g.*, Act § 104(c)(1), (d)(1)(A)(i).

Section 104(c)(2) is therefore best read to apply New Mexico law to the computation of damages that are compensable under § 104(d)(4). Thus, § 104(d)(4) sets out the types of damages eligible under the Act, such as a "decrease in the value of real property," and New Mexico law informs the way such damages are to be calculated. *See, e.g.*, N.M. R. Ann. 13-1819 (calculating property loss based on the "difference between" the "value of the [real] property immediately before the occurrence and immediately after the occurrence"); N.M. R. Ann. 13-1815 (calculating such loss based on the "reasonable expenses of necessary repair to the property damaged plus the decrease, if any, in the fair market value of the repaired property as compared to its fair market value before the occurrence"); N.M. R. Ann. 13-1812 (calculating loss based on the "fair market value of the property immediately before the occurrence"). That is the only reading that is faithful to the ordinary meaning of "calculation"; gives effect to both parts of § 104(c)(2); and respects Congress's repeated efforts to funnel payment determinations through § 104(d). *See* Act § 104(a)(1), (c)(1).

Plaintiffs are further wrong to suggest (*Dolan* Br. 17, 25) that the government's reading would render § 104(c)(2) meaningless or that the

government failed to "explain" which parts of New Mexico law might apply to the valuation of damages. *See* Opening Br. 29 (citing New Mexico standards governing such calculations). And because state law is relevant only to the computation of damages—not the allowable categories of damages—it is not surprising that the inclusions in § 104(d)(4) do not overlap with New Mexico tort law. Nor would such overlap make much sense, inasmuch as damages available under tort law depend on an individualized determination of which torts were actually committed against which plaintiff and are not easily determined by policy-type promulgations. Moreover, if the allowable-damages provision were truly a floor, as plaintiffs suggest (*Dolan* Br. 20; *Lands* Br. 17, 21–26), then it is unclear why Congress would have used either the terms "calculation" or "under" in § 104(c)(2). Instead, Congress could have simply stated that New Mexico law applies to determine the categories of allowable damages "in addition to" those specified in § 104(d)(4).

Plaintiffs also draw the wrong conclusion from Congress's specification that FEMA pay losses for "reforestation," "damage to physical infrastructure," and "risk reduction costs." *Lands* Br. 17; *see* *Dolan* Br. 21. All this shows is that Congress authorized compensation

for the most common types of losses faced by victims of this particular fire. *See* Act § 102(a)(9) (contemplating only "property loss" in its actual findings). The *Lands* plaintiffs' concerns (at 17–18) about calculating readily discernible damages is also easily answered by § 104(c)(2) itself, which states that New Mexico law applies to calculations "[e]xcept as otherwise provided in this Act." In other words, where the amount to be reimbursed is readily discernible—for example, the amount of an insurance deductible—there may be no need to look to New Mexico law to do the math. The *Lands* plaintiffs (at 19–20) also list various examples of New Mexico jury instructions to try to demonstrate a broader definition of "calculation," but all of those examples just go to *valuating* a claim and thus prove the point that New Mexico law readily supplies standards for computing the precise amount owed.

**C.** Plaintiffs also rely heavily on two provisions outside of § 104(d) for their assertion that the Act incorporates all of New Mexico tort law. First, plaintiffs point to the definition of "injury" which has the "same meaning as" that term is used in the FTCA. Act § 103(5) (citing 28 U.S.C. § 1346(b)(1)); *Dolan* Br. 14–16; *Lands* Br. 10–11. But that definition merely supports Congress's definition of "injured person," which is

defined as an "individual" or other entity that suffered "injury" as a result of the Fire. Act § 103(4). Put together, these two definitional provisions speak to *who* can seek payment under the fund, not *what* they can be reimbursed for once eligibility has been established. This is confirmed by § 104(a)(1), which specifies that compensation for "injury" suffered by the "injured person" must be "subject to" two limitations: (1) FEMA's determinations under § 104(d), which includes § 104(d)(4), and (2) the availability of appropriations.

Plaintiffs offer no reason why this one definition, in the middle of a list that defines seven other terms (including "injured person"), should be construed as the Act's "foundational grant." *Dolan* Br. 15. Nor could they, in light of the language in § 104(a)(1)—the operative provision governing payment—subjecting compensation for "injury" by "injured persons" to the determinations under § 104(d). As discussed, the definitions of "injury" and "injured person" instead address the class of claimants who are permitted to file claims under the Hermit's Peak Act, not the types of losses for which they may subsequently be reimbursed.

The fact that Congress referenced the FTCA is not itself surprising. Congress passed the Hermit's Peak Act as an alternative to the FTCA,

creating an administrative scheme in which eligible claimants can obtain relief for substantiated claims quickly and without the burdens and uncertainty of FTCA litigation. Congress thus envisioned the universe of potential claimants with reference to the FTCA, *see* Act § 103(4)–(5), but then gave eligible claimants a choice between the two pathways. *See id.* § 104(h)(1)–(2); *see also id.* § 104(e) (accepting FEMA's offer under the Act is "final and conclusive" and bars related FTCA suits). As part of this tradeoff, Congress limited recovery under the Act to property, business, and financial loss as well as the availability of appropriations. *Id.* § 104(a)(1), (d)(4). To the extent an individual is unhappy with their options under the Act, the claimant may elect to pursue an FTCA action instead, subject to the ordinary requirements and defenses of the FTCA. *See* Opening Br. 12, 26. But the Act is not a "wholesale adoption of the FTCA's core liability framework." *Dolan* Br. 15. Indeed, there are far simpler ways to incorporate the FTCA than the reticulated scheme Congress enacted, and there would have been no reason to specify the

allowable-damages limitation at all if Congress intended to permit any recovery under state tort law.[3]

Nor is it surprising that § 104(d)(4) does not expressly mention personal injury or death, as plaintiffs contend. *Lands* Br. 23–24. The vast majority of damage caused by the Fire and invoked by the plaintiffs involved property loss. Consistent with that fact, the only "loss" identified by Congress in the findings section of the Act is "loss of . . . property." Act § 102(a)(9). That Congress's allowable-damages provision focuses specifically on property, business, and financial loss thus reflects the fact that these are the broad categories of losses suffered by the victims of this particular disaster. And in an effort to

[3] When Congress has allowed an award to encompass noneconomic losses in a federal compensation scheme, it has done so only with respect to physical injuries and has also carefully capped those noneconomic awards. *See* September 11th Victim Compensation Fund of 2001, 49 U.S.C. § 40101 note (Section 405(b)(7)(A)) (limiting noneconomic loss awards for cancer to $250,000 and for non-cancer conditions to $90,000); Radiation Exposure Compensation Act, 42 U.S.C. § 2210 note (Section 4(a)(1)(B)) (setting award to individuals who had leukemia due to nuclear testing to $100,000); *id.* (Section 5) (similar, for uranium miners); *id.* (Section 5A) (similar, for Manhattan project waste exposure). It would be unusual for Congress to cap noneconomic losses in addressing radiation injuries for people who worked in the atom bomb program or deaths that resulted from the September 11th terrorist attacks but allow limitless noneconomic awards for property loss here.

accommodate unanticipated expenses, Congress gave FEMA the discretion to pay for additional losses *within* those three categories, which is why the catch-all provisions granting such discretion are located inside each category's subheading and not adjacent to them. *Id.* § 104(d)(4)(A)(vi), (B)(vi), (C)(x). FEMA has invoked that discretionary authority to, for example, authorize reimbursement for out-of-pocket mental health treatment expenses as a type of "financial loss." 44 C.F.R. § 296.21(e)(3); *see* Act § 104(d)(4)(C).

To the extent plaintiffs argue that the Hermit's Peak Act incorporates the FTCA's waiver of sovereign immunity through the definition of "injury," *Dolan* Br. 23 n.1, they are wrong. The district court rejected this point, App.2.157, and it fails for the same reasons discussed above. The operative provision governing compensation is § 104(a)(1), which is limited by the "determinations required under [§ 104](d)." The definition of "injury" itself thus cannot bear the weight that plaintiffs place on it. It must instead be read alongside the definition of "injured person" to identify the class of claimants who are eligible to seek payment in the first place, but not what they are entitled to once their eligibility has been established. Plaintiffs' theory is also in significant tension with

*United States v. Bormes*, 568 U.S. 6 (2012), which rejected efforts to borrow a sovereign-immunity waiver from one scheme and import it into another. *Id.* at 14 ("Where a specific statutory scheme provides the accoutrements of a judicial action, the metes and bounds of the liability Congress intended to create can only be divined from the text of the statute itself.").

Next, plaintiffs (*Dolan* Br. 16–17; *Lands* Br. 14–16) put significant emphasis on § 104(c)(3), a provision that by its own terms governs the *extent* of damages, not the types of damages compensable under the Act. But § 104(c)(3) is best understood as a limiting provision. That follows directly from the text, which states: "Any payment under this Act . . . shall be *limited* to actual compensatory damages measured by injuries suffered," and "shall not include" punitive damages or "interest before settlement or payment of a claim." Act § 104(c)(3) (emphasis added). Section 104(c)(3) is therefore a provision that restricts compensation on an allowable claim to compensatory damages; correctly reflects that property, business, and financial loss are all examples of compensatory losses; and clarifies that interest and punitive damages are off the table. *See* Opening Br. 36–38.

That Congress went out of its way to exclude interest and punitive damages does not amount to a blanket authorization to pay for everything else—particularly in a provision in which payment for "actual" damages is preceded by language stating "shall be limited to." Act § 104(c)(3)(A); *see also id.* § 104(c)(1) (determinations under this section are to be made "[i]n accordance with" § 104(d)). Nor can such an interpretation be adopted from statutory silence if the upshot would compel the government to pay damages beyond what is unambiguously authorized. *Federal Aviation Admin. v. Cooper*, 566 U.S. 284, 290 (2012).

Plaintiffs do not engage with the above analysis. Nor do they explain why, if § 104(c)(3) already articulates the full universe of available damages, Congress would have needed to lay out some subset of that universe in § 104(d)(4). Plaintiffs' related efforts to elevate the phrase "actual compensatory damage" to serve as some kind of standalone authorization incorporating all of New Mexico tort law again ignores the limiting text in which that phrase is embedded; is inconsistent with § 104(c)(1)'s "in general" requirement that such determinations be made "[i]n accordance with" § 104(d); and is at odds with Congress's statement from the outset that eligibility for

compensation be "subject to" the requirements of § 104(d). Act § 104(a)(1).

Plaintiffs also complain (*Dolan* Br. 9, 19–20) about the government's use of the term "compensation" instead of "actual compensatory damages." But the Act itself repeatedly uses the term "compensation," which also appears in the title of § 104. *See, e.g.*, Act §§ 102(b)(1), 104(a)(1). There is nothing unusual about using Congress's preferred language when describing what is, by all accounts, a compensation scheme for victims of the Fire.

As to the relevance of the Cerro Grande Fire Assistance Act (Cerro Grande Act), the fact that FEMA promulgated a different rule implementing a different statute is no surprise. As plaintiffs concede, the text of the Cerro Grande Act is different from the text of the Hermit's Peak Act. *See Dolan* Br. 26–28; *Lands* Br. 26. Those textual differences readily explain the differences between FEMA's implementation of the two schemes. *See* Opening Br. 38–41; *id.* at 40 (emphasizing that the operative provision of the Cerro Grande Act uses the additive conjunction "and" while the operative provision of the Hermit's Peak Act uses the limiting phrase "subject to"). Plaintiffs brush aside these differences as

mere "textual streamlining" (*Dolan* Br. 27–28; *see Lands* Br. 26–27), but these differences change the meaning of the operative provisions. And in any event, FEMA's implementation of a different scheme with different text has no bearing on the correctness of the agency's regulations here.

**D.** Finally, interpretive canons respecting principles of sovereign immunity counsel in favor of the government's construction of the statute. It is a well-settled principle that courts construe statutes in favor of immunity if a "plausible" interpretation exists that does not authorize money damages beyond what Congress unambiguously intended. *Cooper*, 566 U.S. at 290; *see* Opening Br. 26–27. The Act's plain text and structure easily meet this plausibility threshold for the reasons discussed above. Plaintiffs' contentions regarding *Cooper* (*Dolan* Br. 25–26) repeat their erroneous arguments about the meaning of the choice-of-law and allowable-damages provisions and should be rejected for the same reason. And nothing about *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), undermines the longstanding canon of statutory construction respecting sovereign-immunity principles. That canon, like all other canons of construction, merely informs how courts are to go about the business of interpreting statutes.

Plaintiffs' arguments on this point appear to confuse deference under the *Chevron* framework with a statutory directive to place the relevant determinations in the hands of the administering agency. As discussed, it is *Congress* who has vested the critical determinations regarding payment eligibility in FEMA. *See, e.g.*, Act § 104(a) (subjecting compensation eligibility to FEMA's determinations under § 104(d)); *id.* § 104(c) (vesting FEMA with the authority to "investigate" and "determine" claims). Thus, contrary to plaintiffs' assertions (*Dolan* Br. 7–8, 13; *Lands* Br. 1–2, 26–32), the government is not requesting deference regarding the meaning of an ambiguous statute. Instead, the government's position is that the Act plainly delineates the categories of compensable harm—property, financial, and business loss—and does not otherwise mandate compensation for losses outside of those allowable categories, such as annoyance or sentimental loss.

To the extent the government emphasizes the discretion afforded to FEMA in this statutory scheme, that discretion comes directly from Congress. *See, e.g.*, Act § 104(d)(4). Nothing about *Loper Bright* suggests courts are to ignore such statutory directives. Indeed, *Loper Bright* itself recognized that Congress may, and "often" does, "confer discretionary

authority on agencies" to implement a particular scheme. 603 U.S. at 404.

The district court's interpretation of the Act usurped FEMA's statutory role based on an incomplete and incorrect reading of the governing text. In so doing, the court failed to heed longstanding canons of interpretation respecting sovereign-immunity principles. This Court should reverse on that basis and need not reach the separate issue regarding the district court's treatment of New Mexico law.

## II. The District Court Erred in Considering and Applying New Mexico Law.

**A.** Even if this Court agrees that the Act incorporates New Mexico tort law, the district court erred in declining to vacate and remand the relevant portion of the Final Rule to the agency in the first instance. As discussed above, Congress vested in FEMA the authority to administer this scheme, including by promulgating regulations and determining claims for payment. Act § 104(a)(1), (d), (f). If the district court believed the Final Rule applied the wrong legal framework, then the appropriate course was to vacate and remand the relevant portion of the Final Rule for the agency to reconsider its regulation under the correct framework.

This approach is particularly warranted for the types of fact-specific determinations at issue here.

Plaintiffs' (*Dolan* Br. 34–35) invocation of *Loper Bright* here again appears to misunderstand the difference between *Chevron* deference and a congressional directive that the details of implementing a federal scheme be left in the hands of the administering agency. It also appears to misunderstand the unique role that federal courts play when interpreting *state* law and making predictive judgments about what the highest court in the state would do. Although *Loper Bright* emphasizes a federal court's expertise in statutory interpretation, it does not compel a federal district court to interpret state common law and make factual assessments about liability under that interpretation. The district court's decision to do so contravened Congress's desire to vest these determinations in FEMA and is also at odds with Administrative Procedure Act (APA) review, where a court's role is to review what the agency did and not to conduct its own trial adjudicating disputed facts.

The district court further erred when it concluded that all of the Forest Service's conduct must constitute both a trespass and nuisance as to all affected individuals. Trespass and nuisance are different torts

addressing different harms and ought not be "blur[red]" together. *Padilla v. Lawrence*, 685 P.2d 964, 970 (N.M. Ct. App.), *cert. denied*, 683 P.2d 1341 (N.M. 1984) (table decision). Whether the government committed a tort as defined by state law involves fact-specific determinations about what the government did; what the standard of care required at different times and in different scenarios; and how each individual plaintiff was affected by that conduct. The district court erred in attempting to resolve these individualized questions—which are normally adjudicated in a trial—in an APA challenge to an agency's final rule.

**B.** The district court's state-law analysis is also wrong. Rather than follow the ordinary rule that federal courts proceed with caution when assessing state law, the district court predicted a significant expansion of state law in multiple ways that fails to give appropriate weight to the determinations of the state legislature and state courts.

**1.** The district court predicted that the Supreme Court of New Mexico would conclude that prescribed burns are abnormally dangerous activities. That conclusion contradicts the New Mexico legislature's determination that prescribed burns are "not a public or private

nuisance" and can be carried out with "appropriate precautionary measures." N.M. Stat. Ann. § 68-5-3; *see id.* § 68-5-4 (imposing a negligence standard for injury caused by a prescribed burn). Indeed, prescribed burns are common to the community and serve obvious public purposes, including by reducing a region's overall wildfire risk by removing hazardous overgrowth that can build up over time. *Id.* § 68-5-2 (recognizing "wildland fire hazard reduction" as one of the many public purposes of prescribed burns). New Mexico courts have similarly recognized that prescribed burns are common tools in communities prone to wildfire risk and serve obvious public benefits, and the New Mexico court of appeals has previously held that a large-scaled prescribed burn is not abnormally dangerous. *Rodgers v. City of Loving*, 573 P.2d 240, 241 (N.M. Ct. App. 1977).

The district court ignored the weight of that authority. Plaintiffs justify that error by repeatedly suggesting that the Prescribed Burning Act has "nothing to do" with the prescribed burn in this case, largely because the prescribed burn here turned into a wildfire. *Lands* Br. 66; *Dolan* Br. 30–31; *see also* App.4.105–107; N.M. Amicus Br. 9–11. But the risk that prescribed burns can escape containment is precisely the type

of risk contemplated by the state law, as demonstrated by statutory provisions designed to mitigate that risk. *See, e.g.*, N.M. Stat. Ann. § 68-5-7 (creating a "burn manager" certification program and requiring training to address "weather, fire behavior, smoke management," and other "contingencies"). The state legislature nevertheless chose to impose a negligence standard for injuries arising out of prescribed burns because prescribed burns are "in the public interest" and serve valuable community benefits, including reducing a region's overall wildfire risk. *Id.* § 68-5-3; *see also* N.M. Energy, Minerals & Nat. Res. Dep't, *New Mexico Prescribed Burning Act: Fact Forward*, https://perma.cc/W99X-2XQP (explaining that the legislature "[c]reated a negligence standard" for prescribed burns to protect covered persons who "conduct the burn as a reasonable person would" but an "act of nature" causes the burn to spread out of control). Thus, the mere fact that the risk contemplated by the statute materialized in this case does not render the state legislature's determinations irrelevant.

**2.** Separately, whether the government's conduct constitutes a trespass or nuisance under New Mexico law depends on a fact-specific determination of what the government did and how it affected each

plaintiff. The district court failed to undertake this highly fact-specific inquiry. Instead, the court based its determination on the congressional findings in the introductory section of the statute. *See* Act § 102. But a congressional finding that the prescribed burn exceeded containment and a separate pile burn reemerged after a period of dormancy does not establish a per se violation of New Mexico tort law, which involves a different set of questions and highly individualized determinations of how the Fire affected each plaintiff. *See* Opening Br. 55–60. Nor would it make much sense for Congress to concede state tort liability through the "findings" section of the Hermit's Peak Act, when Congress was otherwise aware of the FTCA and where liability under the FTCA is litigated in a full bench trial. *See* 28 U.S.C. § 2402.

There are a number of specific questions that arise in the context of a tort dispute that the district court did not consider and that APA review of a final rule does not provide an appropriate avenue to answer. For example, in evaluating liability related to the decision to conduct a prescribed burn, a factfinder would need additional information about the safety measures undertaken by the Forest Service at the time, the reasonable foreseeability of the relevant environmental and ground

conditions, and what might have happened had the Forest Service allowed forest debris to continue unchecked. Similarly, in determining the relationship between that conduct and a plaintiff's harm, a factfinder would need more information about the plaintiff's relationship to the affected land. Relevant questions include whether the individual has a possessory interest in the affected land (which is relevant for trespass), whether any trespass-based invasion is intentional or unintentional, whether the affected individual was on the land for the relevant period (which may be relevant for nuisance), and whether the harm from the Fire was the result of a direct invasion or instead of smoke and odors wafting over the land but not directly settling upon the property. *See Padilla*, 685 P.2d at 971 (identifying this distinction).

The district court did not engage in any of this analysis, and plaintiffs do not explain how any of the above questions would be answered by simply looking at § 102. Nor do the *Lands* plaintiffs' extended discussion (at 36–52) of the Forest Service's post-hoc review change the calculus. If anything, their discussion of the various trial-based evidentiary rules only underscores the point that the district court's decision here arose not in the context of a trial (which is the

ordinary process for adjudicating tort claims) but in an APA challenge to an agency regulation.

Finally, the district court was wrong to predict that the Supreme Court of New Mexico would provide damages for annoyance or discomfort for trespass actions, given the absence of any state law on this point and this Court's instruction that federal courts must not expand state law without "clear guidance" from the state's highest court. *Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 948 (10th Cir. 2018). That New Mexico courts recognize noneconomic damages for nuisance actions does not clearly establish that they would do the same for trespass.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

AUGUST E. FLENTJE
*s/ Caroline Tan*
CAROLINE W. TAN
*Attorneys, Appellate Staff*
*Civil Division, Room 7236*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-4171*
*Caroline.Tan@usdoj.gov*

*Of Counsel:*

JAMES EVANS
*Chief Counsel*
JORDAN FRIED
*Senior Counsel*
LINDSAY RAUSCH
*Trial Attorney*

*Federal Emergency*
*Management Agency*

June 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,432 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Caroline Tan*
Caroline W. Tan

## CERTIFICATE OF DIGITAL SUBMISSION

I certify that (1) all required privacy redactions have been made; (2) any required paper copies to be submitted to the court are exact copies of the version filed electronically; and (3) that the electronic submission was scanned for viruses and found to be virus-free.

*s/ Caroline Tan*
Caroline W. Tan

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.

*s/ Caroline Tan*
Caroline W. Tan